**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TAMARA VRABEC, | No. 4:21-CV-00804 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| GEISINGER CLINIC, and GEISINGER MEDICAL CENTER, | |
| Defendants. | |

**MEMORANDUM OPINION**

**APRIL 4, 2024**

Currently pending before the Court is Defendants Geisinger Clinic's and Geisinger Medical Center's Motion for Summary Judgment.[1] For the reasons below, the Court will grant Defendants' Motion in part and deny it in part.

## I.   FACTUAL BACKGROUND[2]

### A.   Vrabec's 2007 Hire and Compensation

Dr. Herbert Ingraham, the chairman of Geisinger Clinic's Department of Ophthalmology, recruited and hired Plaintiff Dr. Tamara Vrabec to join the

---

[1]   Mot. for Summ. J., Doc. 34. Though Vrabec has sued Geisinger Clinic and Geisinger Medical Center and both entities have moved for summary judgment, the only live disputes involve Geisinger Clinic, which the Court will refer to simply as Geisinger.

[2]   The factual background is largely derived from the parties' statements of fact. Where the parties agree on a fact, the Court will cite the corresponding paragraphs of the parties' statements together. *E.g.*, SMF and ASMF ¶ 1. If a fact is disputed, the Court will look to the cited portions of the record, make its own determination, and resolve any disputes in favor of the non-moving party, Vrabec. *Infra* Section II. Further, where Vrabec denies a fact in part or as stated, the Court will treat such facts as admitted in part as appropriate. *E.g.*, *infra* n.4.

Department as a retina specialist in 2007.[3] Geisinger initially offered Vrabec a base salary of $163,000, which Vrabec negotiated up to $180,000.[4] Though Vrabec had previously been employed by Geisinger in 1992,[5] Ingraham was unwilling to offer Vrabec a salary equivalent to Dr. Steven Marks, who had been hired in 1995 and worked continuously for Geisinger since that time.[6] Vrabec began her employment with Geisinger at a 0.6 Full-Time Equivalent ("FTE"), and has fluctuated between a 0.6 and 0.7 FTE during her tenure.[7] From Vrabec's hire until 2016, Geisinger employed a compensation structure in which a physician's salary included a base salary which made up 80% of a physician's compensation and incentive pay accounting for the remaining 20%.[8]

### B.    2016 Compensation Structure

In 2016, Geisinger transitioned to a "base salary model without incentives."[9] All physicians whose 2015 total compensation fell below the 50th percentile in their subspecialty was "stepped up" to that level as part of the transition.[10] The base salary

---

[3]   Def. Statement of Material Facts ("SMF"), Doc. 35, and Pl. Ans. to Def. SMF ("ASMF"), Sealed Doc. 47-1 ¶ 1.

[4]   *Id.* ¶¶ 2-3. Vrabec appears to deny that she negotiated her salary to $180,000 because she recalls that she had asked for, and Geisinger refused an even higher salary. ASMF ¶ 2. That Vrabec may not have gotten everything she asked for does not mean that salary negotiations did not take place or that she was not successful in securing a higher salary than Geisinger's initial offer.

[5]   *Id.* ¶ 4.

[6]   SMF and ASMF ¶ 4. *See also* Pl. Ex. F, Sealed Doc. 47-3 at Appx 294 (Marks hire date).

[7]   SMF and ASMF ¶¶ 8-9.

[8]   *Id.* ¶ 36.

[9]   *Id.* ¶ 40.

[10]   *Id.*

for physicians who were above the 50th percentile was determined by combining their 2015 incentive pay with the 2016 base salary.[11] Two physicians in the Department of Ophthalmology's Retinal Surgery subspecialty group (the "Group"), Marks and Dr. Roy Tuller, fell into the latter group and had their 2016 base salary set accordingly.[12] The rest of the Group—Vrabec, as well as Drs. Mouhammed Abbuattieh, Christopher Cessna, and Benjamin Hale—had their base salaries "stepped up" to the 50th percentile Annualized Base Salary of $518,419 at 1.0 FTE.[13]

Annual raises are determined by the Department Chair, Ingraham, based upon the "employee's prior year performance."[14] In determining a physician's performance the Department Chair is to consider:

> Clinical skill, quality of healthcare delivered, research, teaching, clinician productivity for professional services, relationships with patients, co-workers and others, lectures and publications, attendance at staff meetings and involvement in outside professional organizations. Clinicians with low quality or low productivity scores or other performance issues including those on a performance improvement program may have their compensation reduced until such performance meets expectations. Such reduction does not guarantee continued development if performance does not improve.[15]

---

[11]   SMF ¶ 41; Pl. Ex. F. Appx. 292-295. As Geisinger suggests, it appears that Vrabec has misread the salary schedule which, in her defense, is hardly a model of clarity. The 2016 base salary for all physicians is the greater of the 50th percentile benchmark or that physician's 2015 salary including incentives.

[12]   *Id.*

[13]   *Id.*

[14]   SMF and ASMF ¶ 48.

[15]   Pl. Ex. J, Sealed Doc. 47-5 Appx 209.

The funds available for merit raises is allocated in Geisinger's annual budget and Department Chairs have leeway to distribute these funds as they see fit, provided no individual's raise is excessive.[16] The primary factor considered by Department Chairs in determining merit raises is annual relative value unit ("RVU") productivity; in particular, whether physicians' RVU production meets at least the 60th percentile for the subspecialty based on national surveys.[17]

## C.   July 2019 Performance Improvement Plan

On May 9, 2019, Vrabec's counsel wrote a letter to Geisinger on Vrabec's behalf, stating that Vrabec was "concerned about what appears to be 'targeting' of her and her practice in the form of a diminishment of duties, a reduction of her FTE hours, a failure to equitably assign patient appointments to her, the failure to assign a retina scribe to her, all resulting in an underutilization of her time."[18] In the letter,

---

[16]   SMF and ASMF ¶¶ 49-51.

[17]   *Id.* ¶¶ 20, 53-54, 110. Vrabec disputes the extent to which RVU is a "leading" performance metric, ASMF ¶ 53, which the Court discusses in greater detail below. *Infra* Section IV.A. For present purposes, the Court notes that Vrabec admits that "[t]here is a stated goal that each physician should reach his or her 60% percentile RVU target," ASMF ¶ 22, and that she was aware of such a goal. Opp'n., Sealed Doc. 47 at 14. In a letter to Geisinger from her counsel, Vrabec confirmed that she understood low "utilization scoring . . . adversely impacts her ability to achieve certain forms of discretionary incentive compensation based upon a failure to meet goals." Pl. Ex. H, Sealed Doc. 47-4 Appx 112. Though Vrabec may fault Geisinger for her low productivity, an issue also discussed below, the letter from counsel confirms that she understood the effect of her diminished productivity. Further, the compensation plan expressly provides that "low productivity scores" may result in the reduction of compensation. Pl. Ex. J Appx 209. Therefore, while there may be a dispute as to the extent compensation is, or should be tied to RVU production, suggestions that Vrabec was unaware that it was not a key factor, if not the most important factor in determining merit raises are not well taken. *Cf. e.g.*, ASMF ¶ 110 (disputing that the 60th percentile target is a "key performance metric" because it is not expressly identified as much in the Compensation Plan).

[18]   Pl. Ex. H Appx 112-14.

Vrabec expressed concern that this "targeting" of her practice would result in her missing out on certain discretionary compensation and that she was being held to a higher standard than her colleagues, in particular Dr. Marks.[19] On June 25, 2019, Vrabec received a verbal warning performance improvement plan ("PIP") for tardiness and failing to be available while on-call when a patient presented with a retinal detachment.[20] Vrabec did not suffer any material change to the terms or conditions of her employment because of the verbal warning PIP.[21] A month later, on July 24, 2019, Vrabec received a written warning PIP purportedly related to her actions in accessing charts of another physician's patients.[22] As a result of the PIP, Vrabec suffered consequences including the withholding of half of a 3% merit raise for a period of six months.[23]

In the months following the July PIP, Vrabec continued to have discussions with Geisinger leadership regarding her complaints and relationship with Ingraham, while simultaneously exploring legal options.[24] Vrabec eventually filed a Charge of

---

[19]  *Id.*

[20]  SMF and ASMF ¶¶ 56-59. Vrabec's claim that others were not given PIPs for related conduct, ASMF ¶ 56, is discussed in greater detail below. *Infra* Section IV.C. Further, whether Vrabec received a call at home or not is irrelevant because she does not contest that she was at karate class, and therefore not at home, when she missed the call. *Cf.* ASMF ¶ 59 (denying that she "missed a call while on call regarding a patient with a retinal detachment because she was at karate class" on the grounds that she did not also receive a call on her home phone).

[21]  SMF and ASMF ¶ 60.

[22]  *Id.* ¶ 61.

[23]  ASMF ¶¶ 62-64. Geisinger asserts that the withholding of the raise was not due to the PIP, SMF ¶ 62, an issue the Court discusses below. *Infra* Section IV.C.

[24]  Pl. Ex. J Appx 258.

Discrimination against Geisinger on June 12, 2020.[25] She continued to work for Geisinger throughout, including during the pendency of this litigation.

## II.    PROCEDURAL BACKGROUND

Vrabec initiated this suit with the filing of a Complaint against Geisinger Clinic and Geisinger Medical Center on May 3, 2021, asserting five claims for relief: sex discrimination in violation of Title VII (Count I), retaliation in violation of Title VII (Count II), violation of the Equal Pay Act (Count III), sex discrimination and retaliation in violation of the Pennsylvania Human Relations Act (Count IV), and age discrimination (Count V).[26] Following discovery, Geisinger Clinic and Geisinger Medical Center filed a Motion for Summary Judgment,[27] which Vrabec opposes only as to Geisinger Clinic.[28] Geisinger's Motion is fully briefed and ripe for disposition.[29]

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any

---

[25]  ASMF ¶ 77.
[26]  Compl., Doc. 1.
[27]  Mot. Summ. J., Doc. 34.
[28]  Opp'n., Doc. 47 at 5.
[29]  Supp. Br., Doc. 39; Opp'n. Br.; Reply Br., Doc. 49; Sur-Reply Br., Doc. 52.
      To the extent that Vrabec purports to move for summary judgment herself via her opposition brief, titled "Brief in Response to Defendants' Motion for Summary Judgment and Countermotion for Summary Judgment," that motion is denied as untimely and procedurally improper as she has filed no such motion, no statement of material facts as required by Local Rule 56.1, and the deadline for dispositive motions was November 13, 2023, three months prior to Vrabec filing her brief.

material fact and the movant is entitled to a judgment as a matter of law."  As expressed by the Supreme Court of the United States in *Celotex Corp. v. Catrett*, summary judgment is required where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" on an issue that the "party will bear the burden of proof at trial."[30] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[31]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[32] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved by only a finder of fact because they may reasonably be resolved in favor of either party."[33] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere

---

[30]   477 U.S. 317, 322 (1986).
[31]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[32]   *Celotex*, 477 U.S. at 323.
[33]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

suspicions."[34] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[35]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[36] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[37] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[38] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[39]

Local Rule 56.1 requires all motions for summary judgment to be "accompanied by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." The party opposing summary judgment must then include with its papers an answer to the movant's statement of facts in which it identifies, in corresponding numbered paragraphs, those material facts which the nonmovant

---

[34] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[35] *Port Auth. Of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[36] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 422, 448 (1871)).

[37] *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[38] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[39] Fed. R. Civ. P. 56(c)(3).

contends there is a genuine issue to be tried.[40] "Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."[41] Material facts in the movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."[42]

## IV.  DISCUSSION

### A.  Equal Pay Act

"Claims based on the EPA are evaluated according to a two-step burden-shifting paradigm: 'The plaintiff must first establish a prima facie case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions.'"[43] Here, Geisinger does not contest that Vrabec has established a *prima facie* case.[44] Therefore, the burden shifts to Geisinger "to demonstrate the applicability of one of the four affirmative defenses specified in the Act: (i) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex."[45] At summary judgment, Geisinger faces a high

---

[40]  LR 56.1.
[41]  *Id.*
[42]  *Id.*
[43]  *Johnson v. Fed. Exp. Corp.*, 604 Fed. Appx. 183, 187 (3d Cir. 2015) (quoting *Stanziale v. Jargowsky,* 200 F.3d 101, 107 (3d Cir.2000)).
[44]  Supp. Section V.G; Reply 12.
[45]  *Stanziale*, 200 F.3d at 107, 107 n.6 (citing 29 U.S.C. § 206(d)(1)).

burden; it "must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains."[46]

Claims brought under the Equal Pay Act are subject to a two-year statute of limitations, except as to willful violations which are subject to a three-year statute of limitations.[47] Each paycheck issued to Vrabec at a lower pay rate than her male colleagues constitutes a new discriminatory action for the purposes of EPA accrual.[48] Thus, while conduct prior to the statute of limitations relating to the setting of Vrabec's pay rate would be relevant to establish that she was in fact underpaid, she would ordinarily only be entitled to recover damages dating back either two or three years prior to the initiation of this lawsuit.[49]

However, in moving for summary judgment, Geisinger has not raised a statute of limitations defense to Vrabec's EPA claims.[50] The EPA's statute of limitations "is an affirmative defense and can be waived."[51] In its Answer, Geisinger, pled that

---

[46] *Id.* at 108.

[47] 29 § U.S.C. 225(a). *See also E.E.O.C. v. State of Del. Dept. of Health and Soc. Services*, 865 F.2d 1408, 1418 n.14 (3d Cir. 1989) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988) ("The Equal Pay Act is a part of the FLSA and the same statute of limitations is applicable.").

[48] *Schengrund v. Pennsylvania State U.*, 705 F. Supp. 2d 425, 440 (M.D. Pa. 2009).

[49] *Id.*

[50] *See generally* Supp., Reply.

[51] *Fisher v. Vassar College*, 70 F.3d 1420, 1452 (2d Cir. 1995), *on reh'g en banc*, 114 F.3d 1332 (2d Cir. 1997) (citing *Professional Firefighters Ass'n v. City of Clayton,* 759 F.Supp. 1408, 1415 (E.D.Mo.1991)); *accord Mumbower v. Callicott*, 526 F.2d 1183, 1187 n.5 (8th Cir. 1975); *Hodgson v. Humphries*, 454 F.2d 1279, 1283-84 (10th Cir. 1972).

"Plaintiff's claims may be barred in whole or in part by the applicable statute of limitations and/or failure to exhaust."[52] In its Motion for Summary Judgment, Geisinger does argue that Vrabec's Title VII, ADEA, and PHRA claims are untimely or otherwise barred by a failure to exhaust administrative remedies.[53] However, it does not advance any statute of limitations or timeliness argument as to Vrabec's EPA claims. Generally, the failure to raise an affirmative defense on a motion for summary judgment constitutes an abandonment of the defense.[54] That Geisinger has maintained the defense as to certain of Vrabec's claims, but not raised it as to others, counsels in favor of a finding of waiver.

That Geisinger has waived a statute of limitations defense is relevant here as it informs the inquiry regarding Vrabec's claims as to her compensation from 2007 until 2016. Assuming *arguendo* the application of the statute of limitations, any pay disparity predating 2016 would only be relevant to the extent that Vrabec had unfairly been paid below the minimum salary floor established by the new compensation structure; Vrabec would need to show not just that she was compensated unfairly pre-2016, but that the impact of that unfair compensation continued after she received a nearly 20% raise to bring her salary up to the new

---

[52]   Ans., Doc. 7 at 17.
[53]   Supp. Section V.A.
[54]   *Taha v. Bucks Cnty. Pennsylvania*, 367 F. Supp. 3d 320, 325-26 (E.D. Pa. 2019) (citing *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993); *Yanoski v. Silgan White Cap Ams., LLC*, 179 F.Supp.3d 413, 426 (M.D. Pa. 2016)).

minimum salary floor.[55] Put differently, Geisinger would need to justify only the 8.6% difference between Marks and the minimum salary floor, rather than the entire 30% disparity.[56]  As Geisinger has made no such argument, the Court will evaluate the parties' arguments accordingly.

For ease of discussion, the Court will discuss Vrabec's claims as to her 2007 compensation and her claims related to the transition to the new salary model in 2016 separately.

### 1.    2007 Compensation

There is little authority regarding what an employer must show to establish an affirmative defense based on a bona fide seniority system. The Eighth Circuit has held that "[i]f a seniority 'system' based on longevity with the [employer] is to be relied upon as an affirmative defense, [the employer] must be able to identify standards for measuring seniority which are systematically applied and observed."[57] Interpreting a similar provision of ADEA,[58] the United States Department of Labor found "bona fide seniority system" to mean a system which, though it may be qualified by factors such as merit, capacity, or ability, must be primarily based on

---

[55]  The Court notes that Geisinger's suggestion that Vrabec received a 50% raise, SMF ¶ 43, reflects the same "inability to read the chart in Exhibit F" that it suggests of Vrabec. *Cf.* Reply 6; Opp'n. 10 (referring only to the percentage changes in base pay for 2016). The "% Change in Base Salary" column of the relevant charts does not include the "Available Incentive" for 2015 which accounted for roughly 20% of a physician's salary prior to the new pay plan.

[56]  Marks' total compensation for 2015 was 30.3% higher than Vrabec's when scaled to 1.0 FTE.

[57]  *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995).

[58]  29 U.S.C. § 623(f)(2)(A).

length of service.[59] Further, "[u]nless the essential terms and conditions of an alleged seniority system . . . can be shown to be applied uniformly to all of those affected, . . . it will not be considered a bona fide seniority system."[60]

It hardly seems contestable that any seniority system maintained in good faith would have to be applied uniformly to those affected. Further, requiring that an employer identify the essential "terms and conditions" or "standards" of such a system ensures that an employer is not merely offering a *post hoc* justification in response to charges of discrimination.

With those principles in mind, the Court agrees with Geisinger that, even if the Court considers the short period Vrabec worked at Geisinger in 1992-93, there is no question that "a significant difference in seniority" existed between Vrabec and Marks.[61] However, Geisinger's assertion that a seniority system would explain *any* difference in pay is not well taken. For instance, a seniority system alone would not explain an exponential difference in pay between Marks and Vrabec. To that end, other than conceding that Marks was in fact paid more than Vrabec, Geisinger has not said by how much.[62] Nor has Geisinger pointed to any evidence that the seniority

---

[59] 29 C.F.R. § 1625.8(a).
[60] 29 C.F.R. § 1625.8(a).
[61] Supp. 27.
[62] It appears that Geisinger did not produce any pre-2016 salary records for Marks or any other of Vrabec's colleagues. *See* Ingraham Dep. 61:6-8 (counsel for Vrabec requesting production of such documents for Marks).

system in place prior to 2016 applied equally to those hired after Vrabec.[63] On the contrary, two physicians hired in 2014 and 2015 had substantially higher base salaries than Vrabec—who had seven to eight years of seniority—as Geisinger transitioned to the new compensation model.[64] Even if the Court assumes that Ingraham's testimony is sufficient to establish that a bona fide seniority system was in place, Geisinger has not provided any evidence demonstrating that any pay disparities were a result of that system.[65]

Geisinger's arguments that the pay disparity was based on free market negotiations fails for the same reasons. In *Dey v. Colt Construction & Development Co.*, a case cited by Geisinger, the Seventh Circuit cautioned that undue reliance on market-based evidence "may serve to perpetuate differentials that ultimately may be linked to sex."[66] In *Dey*, the plaintiff brought an EPA claim, complaining that a new employee had been hired in at a higher salary. The Seventh Circuit affirmed a grant of summary judgment after considering the employer's initial offer compared to the

---

[63]   While the salaries of those hired in after the transition to the new pay plan may be irrelevant to this analysis, Reply 5, the salaries of those hired previously are not.
       The earliest data provided to the Court is for 2015. The salaries for 2015 were used to set salaries as Geisinger transitioned to a new compensation model. Pl. Ex. J at Appx 292-95.

[64]   *See id.* (2015 salary for Abuattieh, hired in 2014, 9% higher than for Vrabec; 2015 salary for Tuller, hired in 2015, 15% higher than Vrabec). Though Tuller was an experienced physician who brought with him an established practice, ASMF ¶ 32, the same does not appear to be true of Abuattieh. Opp'n. 9.

[65]   SMF ¶¶ 107-108 (citing Ingraham's testimony as evidence of seniority system).

[66]   28 F.3d 1446, 1462 (7th Cir. 1994).

plaintiff's salary, the ensuing negotiations, and the new hire's "superior educational background."[67]

The other authorities Geisinger relies upon are similarly distinguishable. In *Rhoades v. YWCA of Greater Pittsburgh*, the court granted summary judgment where the proposed comparator negotiated a higher salary based on his prior employment.[68] The Eighth Circuit, in *Horner v. Mary Institute*, held that it was appropriate to offer a higher salary where an applicant's "experience and ability made him the best person available for the job."[69] In *Martin v. Delta County Memorial Hospital District*, the court granted summary judgment where, after failing to fill a role for over a year, an employer, in consultation with recruitment firms, increased the offered salary to attract applicants.[70]

In each of these cases, courts considered, in conjunction with evidence of the relevant salary negotiations, other factors that warranted the claimed wage disparity. Evidence of those other factors—the "market" factors—is critical, as without it any EPA claim would rise and fall based on whether a wage negotiation took place, regardless of the result. Geisinger offers no such evidence. On the contrary, Dr. Ingraham testified that even a Nobel Laureate would be hired in at a lower rate than

---

[67] *Id.*
[68] No. CIV.A09-0261, 2010 WL 2991236, at *8 (W.D. Pa. July 27, 2010), *aff'd sub nom. Rhoades v. Young Women's Christian Ass'n*, 423 Fed. Appx. 193 (3d Cir. 2011).
[69] 613 F.2d 706, 714 (8th Cir. 1980).
[70] No. 19-CV-01339-STV, 2021 WL 6112878, at *12 (D. Colo. Dec. 23, 2021).

physicians already employed by Geisinger.[71] To the extent that Geisinger would not bring in a new physician at a salary equal to or higher than that of any current employee, regardless of that physician's qualifications, it suggests that salaries were not set by the market.

Finally, given the relative dearth of evidence regarding performance-based pay prior to 2016, Geisinger also fails to establish that any payment disparities which continued up to 2016 are due to merit or the quantity and quality of Vrabec's production.[72] Though Geisinger does note that Vrabec "failed to hit the 60th percentile RVU goal for Fiscal Years 2008-2015," it does not provide any evidence regarding the production of other physicians for this time period. Further, in the final year of the pre-2016 salary model, each physician in Department received identical incentive pay which, unless each physician had identical performance, undercuts Geisinger's claims that salaries were based on performance.[73]

Instead, Geisinger suggests that Vrabec "has failed to create an issue of material fact" as to the pay disparity between 2007 and 2016.[74] This assumes that

---

[71]   Ingraham Dep. 57:23-60:13. Ingraham's testimony, if true, is compelling evidence of a strict seniority system. However, as discussed above, there is record evidence which shows that new hires would be brought in at a higher rate than current employees.

[72]   *Cf.* Supp. Section V.H. (citing production metrics from 2016 to the present); SMF and ASMF ¶¶ 24-34 (same).

[73]   Pl. Ex. F Appx 292-95. In 2015, each physician's incentive pay accounted for 20% of their salary, except for Vrabec whose incentive pay accounted for 19.6% of her salary. That Vrabec was the only member of the Group whose incentive pay was not exactly 20% of her salary raises an eyebrow but given the marginal difference and that the Court will deny Geisinger's Motion in relevant part, the Court need not venture down that particular rabbit hole.

[74]   Reply 13.

Geisinger has met its burden to prove an affirmative defense in the first instance. The Court finds that it has not.[75]

### 2.   2016 Compensation

Geisinger's merit system defense as to any compensation disparities under the new compensation model is on firmer evidentiary footing. Everyone, including Vrabec, whose 2015 total compensation fell below the 50th percentile of national compensation had their salary stepped up to the same minimum salary floor.[76] Those who were already compensated above that level received no increase in compensation for 2016.[77] Accordingly, despite Vrabec's arguments to the contrary, there is no evidence of any discriminatory disparate compensation as part of the transition to the new salary model.[78]

As to the 2016 compensation model itself, Vrabec asserts that Geisinger's merit system argument fails for three reasons: "(1) there is no written policy that merit pay is based solely on RVUs, (2) the written compensation policy dictates many other factors to be considered, and (3) to the extent that productivity was a

---

[75]   As a result, the Court need not address Vrabec's arguments regarding the impact of the onboarding of Dr. Hale in 2013, a younger male physician to whom she claims Geisinger improperly diverted patients and procedures to.

[76]   Pl. Ex. F Appx. 292-295.

[77]   *Id.*

[78]   Arguing to the contrary in her sur-reply, Vrabec takes issue with Hale receiving a 75% raise to bring him to the salary floor. Not only did Hale receive a 40%, not 75% raise, *supra* n.55, this argument assumes that the seniority system which had purportedly been in place prior to 2016 remained in effect. Geisinger is not obligated to compensate according to seniority.

driving force, the Clinic hindered Vrabec's production for years."[79] The Court addresses each in turn.

### a. Pay is Not Based Solely on RVUs

Vrabec's attempt to fault Geisinger for failing to "communicat[e] to her that *all* of her merit pay, or others in her Department, was directly correlative to" meeting the 60th percentile RVU target begs the question by assuming that there was such a policy to communicate. A cursory review of Vrabec's and her colleagues' merit pay relative to their RVU production reveals no such policy.

As an initial matter, as Vrabec has never met the 60th percentile RVU target but has received a merit raise each year under the 2016 compensation model, it cannot be the case that all her merit pay was based on meeting that goal.

Further, not only has Vrabec failed to meet the 60th percentile mark, the differences in RVU productivity between Vrabec and her colleagues is stark.[80] Of the six physicians in the Group from 2016-2022, Vrabec had the lowest RVU productivity each year. She also had the five least productive years, as measured by RVU, during this period: The lowest RVU production of any other physician in the group during this seven-year period was 47% whereas Vrabec posted years of 17%, 41%, 28%, 20%, and 33%.

---

[79] Opp'n. 12 (numbering added).
[80] The figures cited in this paragraph are found in SMF and ASMF ¶¶ 23-35 and Pl. Ex. F Appx 292-95 and compiled in the Appendix filed with the Court's Opinion.

Nevertheless, Vrabec consistently received raises similar to those who had significantly higher RVU production. In 2017, she received a 3% raise with a prior year RVU of 17%. Another physician with an RVU of 51% received the same raise. In 2018, Vrabec received a 1% raise with a prior year RVU of 41%. Other physicians received 2% raises after posting prior year RVUs of 76%. In 2019, Vrabec received a 3% raise, with half of the raise deferred until February 2020, after posting an RVU of 50%.[81] Other physicians received raises of 3%, 3%, 5%, and 3% after posting RVUs of 65%, 77%, 78%, and 75% respectively. In 2021 and 2022, each physician received identical raises.

Digging deeper, the record shows that Vrabec has been paid 26%-43% *more* than her peers relative to her RVU production. Excluding 2020-2022, when either equal or no raises were given, Vrabec's colleagues received a 1% merit raise for every 17.8 RVUs compared to Vrabec's rate of 14.1 RVUs for every 1% raise.[82] If 2021-22 are included, Vrabec's peers were awarded a 1% raise for every 19.9 RVUs whereas she received a 1% raise for every 12.5 RVUs.[83]

To the extent that Vrabec suggests that Geisinger's merit system defense fails because compensation is not, in fact, tied solely to RVU production, that argument

---

[81] The parties dispute why half of the raise was withheld. *See infra* Section IV.C; SMF and ASMF ¶¶ 62-65. For the sake of comparison, the Court applies the entire 3% raise to 2019, as no other physician received a raise in 2020. Even if the Court considered the raise as two 1.5% raises awarded in 2019 and 2020, the analysis remains the same. App. 1, 3.

[82] *Id.* 4

[83] *Id.* 2.

is not well taken. "An employer need not show that the merit system is devoid of subjectivity, so long as it applies the subjectivity using clear, predetermined criteria."[84] As Vrabec notes, the Compensation Plan for Clinical Professional Staff sets out such criteria.[85] Whether that criteria was followed is a separate issue, which the Court turns to below.

### b.    Other Factors are Considered

Vrabec asserts that Geisinger "failed to compensate [her] for her other contributions that were to be rewarded for merit: research, teaching, taking great care of patients, clinical skill, quality of health care delivered, lectures and publications, [and] participating in outside professional organizations."[86] However, Vrabec was "the only physician in the Eye Institute who receive[d] protected research time."[87] Also, based on the evidence in the record, Vrabec has been paid *more* than her peers relative to her RVU production, suggesting that her intangibles have been taken into account.

Vrabec also does not provide any information regarding the consideration, or lack thereof, of such factors regarding her colleague's compensation. Vrabec

---

84   *Cooke v. U.S.*, 85 Fed. Cl. 325, 347 (2008) (collecting cases). *See also Mullenix v. U. of Texas at Austin*, No. 1-19-CV-1203-LY, 2021 WL 5881690, at *6 (W.D. Tex. Dec. 13, 2021) (citing *Scott v. Dallas Cnty. Hosp. Dist.*, 85 F. App'x 361, 361-62 (5th Cir. 2003) ("[A] merit system may be administered systematically and objectively while permitting some level of subjectivity as to the weighing of nondiscriminatory factors.").

85   Opp'n. 14 (citing Pl. Ex. H, Appx 107).

86   *Id.* 15.

87   Pl. Ex. J, Appx. 247. Vrabec lost her research time as a result of her PIP, as discussed *infra*.

notes that a 2017 compensation memo states that it is her responsibility to "take great care of patients; help us recruit and retain; as we get staffed up, providing same day appointments; teaching; research; and being a good citizen" and she claims that she "did all those things well."[88] That may well be the case, but Vrabec again begs the question, assuming that not only did she do those things well, but that she did them so much better than her colleagues to justify receiving equal merit pay despite having far lower RVU production.[89] Vrabec's mere belief that Geisinger does not properly value her intangibles is insufficient to create an issue of material fact.

### c.     Vrabec Fails to Show Geisinger Hindered Her Production

The fact that Vrabec is better compensated than her colleagues in relation to her RVU production also dooms her claims that Geisinger has "hampered" her production. Vrabec alleges that her low RVU production is attributable to actions taken by Geisinger. In particular, she insists that Geisinger, "though the control of scheduling, redirecting of patients and procedures to younger males, creating malfunctioning templates, with unavailable blocks 'not seen' for scheduling, and providing wrong measurements for RVUs," hampered her production and, as a result, her pay and advancement.

---

[88]   Opp'n. 14.

[89]   As Geisinger notes, in support of her claim that she performed well in non-RVU areas, Vrabec largely relies on evidence predating the 2016 policy. Reply 14-15.

Unfair scheduling practices, resulting in fewer patients or less profitable procedures, may constitute an adverse employment action.[90] So too the refusal to assign a scribe.[91] To that end, Vrabec insists that, if only her templates worked, new patients were scheduled with her, she was scheduled to perform high RVU procedures, or she were assigned a scribe she would have been more productive. Such allegations would be sufficient to survive a motion to dismiss. However, summary judgment is the time for facts, and Vrabec does not confront the fact that she had been paid as if she were more productive all along or that, after being assigned a scribe, she became *less* productive.[92]

Even if that were not the case, Vrabec has not established the existence of any unfair scheduling practices. Operations Manager Jill Karchner testified accommodating a physician's "template needs" is a "really difficult balancing act" and that she is "constantly looking at templates and adjusting them" to try to achieve that balance.[93] She explained that there had been universal issues in the past regarding doctor preferences[94] and scheduling for new patients.[95] Vrabec, through

---

[90] *See Remp v. Alcon Laboratories, Inc.*, 701 Fed. Appx. 103, 107 (3d Cir. 2017) (citing *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 319 (3d Cir. 2000)) (placing employee in less profitable position constitutes an adverse employment action).

[91] *See id.* (citing *Durham Life Insurance Co. v. Evans*, 166 F.3d 139, 153–54 (3d Cir. 1999)) (dismissing an employee's secretary constitutes an adverse employment action).

[92] After being assigned a scribe in 2020, her RVU figures for that year and the next two were 28, 20, and 33, her lowest RVU years under the new pay plan other than when she was at the 17th percentile for RVUs in 2016.

[93] Karchner Dep., Pl. Ex. A., Doc. 44-1, at 27:15-28:2.

[94] *Id.* 37:11-38:20.

[95] *Id.* 44:3-45:9.

biennial communications with Karchner and others, established that she has had recurring issues with filling her schedule.[96] But recurring issues with scheduling are not unique to Vrabec. Nor is there any evidence from which a reasonable juror could infer that they are the result of discrimination. On the contrary, Karchner, as part of a larger review of physician templates, reached out to Vrabec regarding making changes to increase Vrabec's availability for new patients.[97]

Vrabec has also failed to adduce any evidence that issues with scheduling—a constant and widespread issue—are unique to her. To the extent that Vrabec struggles with her templates or scheduling more than other physicians, which is hardly obvious from the record, she does not address the testimony of Manager of Capacity Management, Tara McLaurin, that physicians can work with their operations managers to modify their templates as often as they like.[98] Instead, Vrabec invites the Court to simply assume that this process is failing her, and only her.

---

[96]   *See* Pl. Ex. J, Appx 256 (Dec. 1, 2011 Email), Appx 255 (Apr. 24, 2014 Email), Appx 252 (Apr. 5, 2016 Email), Appx 254 (Oct. 25, 2018 Email), Appx 257 (Sept. 28, 2020 Email); Pl. Ex. A, TV40 (Jul. 20, 2020 email). On other occasions, Vrabec commented that she was busier than her peers. *E.g.*, Pl. Ex. I, Appx 191 (Sept. 2019 email from Vrabec stating that she, without the aid of a scribe, saw more patients than providers who had full time scribes).

[97]   Pl. Ex. J, Appx. 253. The Court also notes that, in response to a mass email from Karchner regarding a backlog of patients created by the COVID-19 pandemic, Vrabec responded that she had several unfilled "templated" slots. Pl. Ex. D, Doc. 44-4 at TV40. Vrabec's suggestion that, in the face of a patient backlog which prompted Karchner to send the providers a plea for help, Geisinger had simply opted to not schedule patients with Vrabec, and that Vrabec herself was unaware of both the unfilled spots on her calendar and the backlog of patients, strains credulity.

[98]   McLaurin Dep., Def. Reply. Ex. A., Doc. 49-1, 18:3-19:9.

Nor has Vrabec established that it is improper for Dr. Marks to refer his patients to Dr. Onishi as he downsizes his practice. Though Vrabec could do the work and care for the patients being transferred to Onishi, she has not cited to any policy or other authority that would entitle her to do so. Vrabec's belief that it would be more appropriate for those patients to be sent to her is insufficient to establish that Geisinger's policy allowing Marks to refer his patients as he sees fit is discriminatory.

As to the unequal distribution of "high RVU procedures" generally, Vrabec did perform far few retina injections than her peers.[99] However, Karchner testified that those scheduling patient visits do not have any information regarding which type of visits or procedures generate the highest RVUs or greatest revenue.[100] Further, as Vrabec observed, many of her colleagues refuse to perform low RVU procedures such as diabetic screenings, whereas she does not.[101] That many physicians will refuse to perform less profitable procedures may be regrettable, and Vrabec's continuing to perform such procedures laudable, it is not evidence of discrimination.

Vrabec also does not confront the fact that she saw new patients at a higher rate than her peers.[102] Excluding Dr. James Kasenchak, who was hired in 2019 and

---

[99] Vrabec performed an average of 1,599 injections per FTE from 2018 through 2022, compared to her colleagues' average of 2,474. Def. Ex. O, Doc. 36-4; App. 5.
[100] Karchner Dep. 60:7-22.
[101] Opp'n. 19.
[102] SMF and ASMF ¶ 102.

represents an extreme outlier, Vrabec saw 248 new patients per FTE, compared to her colleagues' rate of 231 new patients per FTE.[103] Further, the Court notes that after Kasenchak was hired Vrabec's rate of new patients dramatically *increased* whereas the new patient rates of her colleagues dramatically decreased or remained relatively stable, undercutting her claims of discrimination.[104] With one exception, a similar, though less pronounced phenomenon occurred with the rate of injections.[105]

Thus, the difference in RVU production is explained by the non-discriminatory justification Vrabec herself offers:

> A new patient exam or diabetic screening will generate less RVUs than injections, surgery, or other more complex procedures. So it is possible to work more hours, see more patients and generate less RVUs depending upon what patients and procedures are booked on a physician's schedule. Many physicians refuse to see diabetic screenings, while Vrabec does not.[106]

While Vrabec has perhaps identified a flaw in Geisinger's compensation structure—incentivizing physicians to eschew certain patients and procedures in favor of those which are more profitable—that does not render it discriminatory. To the extent that Vrabec, the most experienced physician in the Group, does not refuse to see certain patients whose medical issues do not create as much revenue for herself

---

[103] App. 6. FTE information as included in the Appendix can be found in Pl. Ex. F Appx 292-96 and new patient and injection data at Def. Ex. O.

[104] *Id.*

[105] App. 5.

[106] Opp'n. 19. The Court also notes that Kasenchak, whose high rate of new patients and low rate of retinal injections is an outlier in the Group, further evidences this phenomenon, as well as undermines Vrabec's claims that she was being harmed by the onboarding of younger male physicians.

or the hospital, that is commendable, and that she is penalized for doing so is unfortunate, but it is also an issue beyond the Court's purview.

In support of her claims, Vrabec routinely directs the Court to discrete statistics and communications, arguing that they are pieces of a larger puzzle which shows she had been discriminated against. In a vacuum, the documents Vrabec points to would seem to fit that larger puzzle. However, those pieces are less than the sum of their parts. Vrabec has had a long, and often contentious career at Geisinger. She has not been shy—nor should she be—about asking pointed questions or standing up for herself when she believes she has been unfairly treated. As such, she has succeeded in developing a rather robust record of such conversations. But that is all the record shows: that Vrabec has long *believed* she has been unfairly treated. She has failed to adduce any evidence that she was *in fact* unfairly treated based on her age or sex. Vrabec's failure to meaningfully engage with any of the various metrics she relies on dooms her claims of discrimination.

## B.    Title VII, ADEA, and PHRA Discrimination

Vrabec's claims of sex discrimination under the Pennsylvania Human Relations Act[107] and Title VII of the Civil Rights Act[108] and age discrimination under the Age Discrimination in Employment Act are largely governed by the same

---

[107]  43 Pa. C.S. § 951 *et seq.*
[108]  42 U.S.C. § 2000e-2(a).

standards:[109] Absent proof of purposeful discrimination, to state a *prima facie* case of discrimination Vrabec must show (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination.[110] To state a claim under Title VII, Vrabec need only show that her sex was a "motivating  factor" whereas to state an ADEA claim she must show that she was discriminated against "because of" her age.[111]

Vrabec has satisfied the first two prongs under both Title VII and ADEA because she is a sixty-two-year-old[112] woman[113] and Geisinger does not dispute that she was qualified for her position. Therefore, whether Vrabec can state a claim for discrimination turns on the third and fourth prongs. If she does do so, the burden then shifts to Geisinger to "articulate a legitimate nondiscriminatory reason for the adverse employment action."[114] Then, the burden shifts back to Vrabec "to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual."[115]

---

[109] *McNeill v. Greyhound Lines, Inc.*, 628 Fed. Appx. 101, 103 n.1 (3d Cir. 2015) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir.1999)) (Title VII and PHRA); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 n.4 (3d Cir. 2015) (ADEA and PHRA).

[110] *Jones v. S.E. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015); *Willis*, 808 F.3d at 644.

[111] *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 174 (2009).

[112] *Willis*, 808 F.3d at 644.

[113] *Scheidemantle v. Slippery Rock U. State System of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

[114] *Willis*, 808 F.3d at 644 (quoting *Jones*, 198 F.3d at 412).

[115] *Id.* (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426-27 (3d Cir. 2013)).

"Given their marginally distinct allocation of burdens, courts have noted that '[i]t is possible that a plaintiff could fail to meet its burden of proving a Title VII violation, and at the same time the employer could fail to carry its burden of proving an affirmative defense under the Equal Pay Act.'"[116] However, where, as here, a Title VII, ADEA, or PHRA claim is based on compensation discrimination, and therefore "merge[s] with the Equal Pay Act Claim," a loss on one claim is likely fatal to all.[117] Whether viewed as a failure to show that the circumstances of her disparate compensation gives rise to an inference of discrimination or as Geisinger's success in showing that the salary differences were based upon merit, Vrabec's Title VII, ADEA, and PHRA discrimination claims relating to her compensation under the 2016 policy fail for the same reasons as her analogous EPA claims.

As to her claims regarding her pre-2016 compensation, they are subject to the limitations period imposed by Title VII and ADEA. To bring suit under Title VII or ADEA, "a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment

---

[116] *Summy-Long v. Pennsylvania State U.*, 226 F. Supp. 3d 371, 413-14 (M.D. Pa. 2016), *aff'd,* 715 Fed. Appx. 179 (3d Cir. 2017) (quoting *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994)).

[117] *Id.* at 414 (collecting cases). Illustrative of the overlap between each of Vrabec's EPA, Title VII, ADEA, and PHRA discrimination claims is that her arguments in support of the latter three claims simply incorporate her arguments in support of her EPA claims. *See* Opp'n. 23 (citing Section V.A.), Section V.E.

practice."[118] Vrabec filed her EEOC complaint as to Geisinger on June 12, 2022.[119]

The 300-day lookback period for her claims therefore begins on August 17, 2019.[120]

"Title VII makes it an 'unlawful employment practice' to discriminate 'against any individual with respect to his compensation . . . because of such individual's . . . sex.'"[121] A pay discrimination claim is timely as to paychecks received within the 300-day lookback period "if they reflect a periodic implementation of a previously made intentionally discriminatory employment decision or other practice."[122] Therefore, to the extent that Vrabec has stated a valid claim of compensation discrimination, any such claim is timely to the extent that it impacted paychecks received after August 17, 2019. If Vrabec can show that, had she been fairly compensated at the time of the transition, her total base salary plus incentives for 2015 would have exceeded the 50th percentile, the impact of any lost wages would compound with each year's merit raise and impact paychecks, if only marginally, within the limitations period, rendering such claims timely.

---

[118] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1) (Title VII); *accord Ruehl v. Viacom, Inc.*, 500 F.3d 375, 382 (3d Cir. 2007) (ADEA).

[119] Pl. Ex. J, Doc. 44-10 at Appx 272.

[120] Geisinger, in what the Court assumes is a typo, suggests that Vrabec's EEOC complaint was filed on June 22, 2022, and therefore incorrectly identifies the 300-day lookback period as starting on August 27, 2019. Supp. 8.

[121] *Mikula v. Allegheny Cnty. Of PA*, 583 F.3d 181, 185 (3d Cir. 2009) (quoting 48 U.S.C. § 2000e-2(a)(1)).

[122] *Id.* at 186 (internal quotations removed) (citing *Morgan*, 536 U.S. 101; *Hildebrandt v. Illinois Dept. of Nat. Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003); 42 U.S.C. § 2000e-5(3)(A)).

### C.     Retaliation

As an initial matter, the Court agrees with Vrabec that, as to the July 2019 PIP, the process was not complete until Dr. Alfred Casale issued his decision regarding Vrabec's appeal of the matter. The purpose of requiring an employee to bring an EEOC charge is to allow the parties an opportunity to resolve the matter. Arguing that timeliness should be determined from the date of Dr. Ingraham's decision, prior to Vrabec's appeal, Geisinger effectively seeks to punish Vrabec for seeking to resolve the issue within Geisinger. The Court declines to do so.

To establish a *prima facie* claim of retaliation, Vrabec must show that (1) she engaged in a protected activity; (2) Geisinger took adverse action against her; and (3) there exists a causal connection between his protected activity and the adverse employment action.[123] To establish causation at the *prima facie* stage, Vrabec must point to evidence which could "support the inference" of a causal connection between the adverse action and the protected activity.[124] If Vrabec establishes a *prima facie* case, the familiar *McDonnell Douglas* burden-shifting framework applies: Geisinger must articulate a legitimate reason for the adverse action, then Vrabec must show that reason is mere pretext.[125] At that stage, she also must show

---

[123] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).
[124] *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).
[125] *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016).

that her participation in protected activity was the "but-for cause" of any alleged adverse employment action that she suffered.[126]

Geisinger does not dispute that Vrabec engaged in protected activity when her attorney filed an "internal charge" on May 9, 2019.[127] Vrabec asserts that the written PIP she received in July 2019 constitutes an adverse employment action.[128] Geisinger suggests that it does not because Vrabec "did not suffer any loss of compensation." In support, Geisinger directs the Court to a July 2, 2019 email, predating the PIP, which Ingraham informs Vrabec that half of her 3% merit raise will be withheld due to poor performance.[129] However, other evidence in the record shows that Vrabec's merit pay was deducted by 1.5% as a result of the PIP, which is, as discussed above, sufficient to establish an adverse employment action.[130] Further, Vrabec also lost her 0.1 FTE of research time, forcing her to either accept a reduction in pay or increase her clinical time, which also constitutes an adverse employment action.[131] Given the conflicting evidence, and the Court's obligation to

---

[126] *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

[127] Supp. 22.

[128] As to other purported retaliatory actions taken by Geisinger—*i.e.*, scheduling issues, denial of a scribe, a verbal PIP—Vrabec suggests that these are evidence of Geisinger's motive, rather than discrete retaliatory acts. Opp'n. 28 n.4. Consistent with this position, the entirety of the corresponding section in Vrabec's opposition discusses only the written PIP. *Id.* Section V.C.

[129] Def. Ex. I, Doc. 35-10.

[130] Pl. Ex. I, Doc. 44-9 Appx 220. Further, July 24, 2019 is the date that the PIP was finalized, save for Vrabec's appeal to Dr. Casale. Geisinger has not pointed the Court to any evidence of when the process began, which may well have been before Dr. Ingraham sent his email, which would undercut Geisinger's argument on this point.

[131] Pl. Ex. I Appx 218.

construe such evidence in the light most favorable to the non-moving party, whether Vrabec can establish a *prima facie* claim of retaliation turns on the third prong.

"Because retaliation is almost never subject to proof by direct evidence" a plaintiff will generally have to "rely on circumstantial evidence to prove a retaliatory motive."[132] Vrabec can satisfy her burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism with timing that suggests a causal link."[133] Approximately two-and-a-half months elapsed between the May 9 letter and the July PIP, a period that the Third Circuit has held is not unusually suggestive.[134] Therefore, Vrabec will need to proceed under the second prong.

As Vrabec notes, Dr. Ingraham stated in an email to Interim CMO Dr. Casale, "[w]hile legal and HR said [the May 9 letter] should not be mentioned as part of [the PIP] process, it was the elephant in the room."[135] Ingraham further related to Casale, who was responsible for evaluating Vrabec's appeal, that the PIP took place in the context of "volumes of emails generated with or about Dr. Vrabec over the last few

---

[132] *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).

[133] *Id.*

[134] *Williams v. Phila. Hous. Auth. Police Dep't,* 380 F.3d 751, 760 (3d Cir. 2004).

[135] Pl. Ex. J, Appx 226. Ingraham testified that he was "clearly" referring to Vrabec's animosity towards Marks as the elephant in the room. Ingraham Dep, Doc. 35-3 at 246:7-20. While that is a plausible reading, viewing the record in the light most favorable to Vrabec, as the Court is obliged to do, it is not clear that it was not, in fact, the letter from Vrabec's attorney that was the "elephant in the room" or that the letter was separable from Vrabec's feelings of animosity towards Marks in this context.

months," which would undoubtedly include the May 9 letter.[136] Ingraham also testified that he had not issued a PIP "the last 12 or 15 years," before issuing two to Vrabec in a matter of weeks following the May 9 letter."[137] Further, a few months later, Chair of the Geisinger Surgery Institute Dr. Mohsen Shabahang indicated to Vrabec that her pursuit of legal remedies was "destructive" to her remaining in the department.[138] Shabahang gave Vrabec one week to decide whether to pursue "a legal case" or to attempt to repair her relationship with Ingraham.[139] As a practical matter, Shabahang may have a point; it is undoubtedly difficult to maintain working relationships with colleagues who are exploring legal action. As a legal matter, his actions were improper.[140]

Having found that Vrabec has established a *prima facie* case for retaliation, the burden shifts to Geisinger to present evidence that, if true, "would permit the conclusion that there was a nondiscriminatory reason" for the PIP.[141] Then, the burden shifts back to Vrabec to show "both that [Geisinger's] proffered explanation was false, and that retaliation was the real reason for the adverse employment

---

[136] Pl. Ex. J, Appx 226.
[137] Ingraham Dep. 248:20-23. Ingraham could also be understood as testifying that he had not issued written PIPs specifically in the prior 12-15 years. Nevertheless, he earlier testified that even verbal PIPs are "something which [he] rarely go[es] to." *Id.* 191:5-7.
[138] Pl. Ex. J, Appx 258.
[139] *Id.*
[140] *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 350 (3d Cir. 2022) (reversing grant of summary judgment where employer attempted to intimidate plaintiff into dropping lawsuit).
[141] *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994).

action."[142] Geisinger asserts that the PIP was issued for "a breach of professional ethics and creating a situation where [Vrabec] could cause another physician to suffer damage to his professional reputation."[143] Geisinger also maintains that Vrabec did not have the authority to continue to access the charts of another physician.[144] For her part Vrabec insists that she "sought and received all internal approvals, violated no policy, rule, procedure, code of conduct, ethics or otherwise."[145]

The purported breach of professional ethics is, as described in the PIP, Vrabec's "report[ing] the patients of another physician without the latter's knowledge, consent, or cooperation."[146] Appealing the PIP, Vrabec asserted that "[i]t is not a requirement to include another doctor in research."[147] She also insisted that, contrary to Ingraham's suggestion, Marks would not be precluded from publishing his own research based on the relevant patients and that, because Marks would not be identified in her presentation, there was no meaningful risk of embarrassment to Marks.[148] Casale did not address Vrabec's arguments, instead upholding the PIP on alternate grounds.[149] In support of summary judgment, Geisinger echoes Ingraham's

---

[142] *Id.* at 763.
[143] Supp. 24.
[144] *Id.*
[145] Opp'n. 25.
[146] Pl. Ex. J Appx. 227.
[147] *Id.* at Appx. 231.
[148] *Id. See also* Ingraham Dep. 229:11-230:10 (Ingraham testifying that nothing in Vrabec's abstract would have identified Marks).
[149] Pl. Ex. J Appx. 234-35; Ingraham Dep. 235:19-236:9.

charge of a breach of professional ethics, and Vrabec, in opposition, again argues that her conduct did not violate any code of professional ethics.

Given that the American Medical Association maintains a Code of Medical Ethics, which include the Ethics of Interprofessional Relationships, identifying any breach should be relatively straightforward.[150] And yet, in its Reply brief, Geisinger still fails to identify the rule it insists Vrabec violated.[151] That Ingraham and Casale also could not agree on what it is Vrabec is to have done wrong further lends support to her claim that, at a minimum, her actions did not warrant a PIP.[152] As does the fact that Ingraham had not issued a PIP in over a decade.[153] Particularly when viewed as one instance in a larger pattern, which includes Dr. Shabahang's suggestion that she could not remain in the department if Vrabec pursued legal action, a reasonable juror could find that the May letter from Vrabec's counsel was the "but-for" cause of the July PIP.

---

[150] *Ethics*, AMA (last visited Mar. 1, 2024), https://www.ama-assn.org/delivering-care/ethics.

[151] On the contrary, any discussion of Vrabec's retaliation claim is entirely absent from Geisinger's reply brief.

[152] *See Branch v. Temple U.*, 554 F. Supp. 3d 642, 655 (E.D. Pa. 2021) (citing *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017); *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir. 2000)) (inconsistent explanation for taking an adverse employment action may establish pretext).

[153] *Cf. Young v. City of Philadelphia Police Dept.*, 651 Fed. Appx. 90, 99 (3d Cir. 2016) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (evidence that employee "was subject to more discipline than [others] who engaged in similar conduct" can support claim of pretext).

## V.   CONCLUSION

For the foregoing reasons, Geisinger's Motion is granted in its entirety as to Geisinger Medical Center, and granted in part as to Geisinger Clinic; summary judgment is granted in favor of Geisinger Clinic as to Vrabec's Title VII (Count I), Equal Pay Act (Count III), Pennsylvania Human Relations Act (Count IV), and Age Discrimination in Employment (Count V) claims regarding allegations of pay disparities resulting from the 2016 compensation plan. Geisinger's Motion is denied as to those claims regarding allegations of pay disparities prior to 2016, and the continuing impact of such disparities following the implementation of the 2016 compensation plan, as well as to Vrabec's Count II and IV retaliation claims.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge